STATE OF MAINE                                    SUPERIOR COURT
CUMERLAND, SS.                                    CIVIL ACTION
                                                  DOCKET NO.: CV-19-254


CATHERINE REAGAN,                        )
                                         )
                                         )
                  Plaintiff              )        JUDGMENT
                                         )
         v.                              )
                                         )
ROBERT CAHEE,                            )
                                         )
                  Defendant              )
                                         )
                                         )


## BACKGROUND

1.  From 2002 (Trial Ex. D (Cahee Dep.) 23:7-8) until he sold the property in 2017 (Trial Ex. C (Krainin Dep.) 64:4-8), Defendant Robert Cahee was the owner of a house located at 124 Acadia Road, Casco, Maine. Complaint ¶4, Answer ¶4.

2.  In 2015, Cahee rented out the 124 Acadia Road on a weekly basis through Krainin Real Estate. (Cahee depo. at 24:3-13, 32:1-6, 33:10-16.)

3.  Cahee kept 124 Acadia Road to rent it to vacationers. (Cahee depo. at 22:2-4.)

4.  124 Acadia Road had a futon on the first floor, which had been purchased by Cahee shortly after he purchased the property in 2001. (Cahee depo. at 14:8-10, 40:9-11.)

5.  Cahee advertised 124 Acadia Road as a weekly rental

6.  The online listing of 124 Acadia Road stated that guests could sleep in one of the three bedrooms on the second floor, and on the "[d]ouble futon in [living room]." (Exhibit D3; *see also* Exhibit G ("Otto depo.") at 9:14-23.

7.  Joint Exhibits G3 and G4 are photographs that truly and accurately depict the living room and the dining room of 124 Acadia Road on August 1, 2015. (Otto depo. at 13:3-14:1.)

8.  On August 1, 2015, the living room of 124 Acadia Road had a sunken entryway, measuring four feet by five feet directly inside the front door ("the Sunken Entryway"). (Trial testimony of George Melchior ("Melchior test."); Exhibits G4, D2.

REC'D CUMB CLERKS OFC
FEB 18 '22 AM 11:44

1

## I. THE FALL

9. On August 1, 2015 Ms. Reagan traveled by car with one of her sons and his wife from Cortland, New York to Maine. (Trial Ex. H (Reagan Dep. June 29, 2020) 9:20-10:5).

10. Ms. Reagan did not enter the house at 124 Acadia Road until after she met the rest of her family met for dinner at a restaurant following the wedding rehearsal. (Trial Ex. G 16:3-9; Trial Ex. H 10:6-23).

11. After dinner at the restaurant, Ms. Reagan traveled to 124 Acadia Road with her daughter, Ms. Otto. (Trial Ex. G 16:3-9).

12. When Ms. Reagan first entered the house at 124 Acadia Road, she entered through the door that opens to the recessed entryway. (Trial Ex. H 10:24-11:3).

13. When she entered the house at 124 Acadia Road, Ms. Reagan saw and was aware that she needed to step up from the entryway to the level of the main floor. (Trial Ex. H 26:6-22).

14. Ms. Reagan's family had decided that the most convenient place for Ms. Reagan to sleep on the night of August 1, 2015 was a futon located on the main floor of the house, close to the recessed entryway. (Trial Ex. G 17:21-18:15; 38:7-12).

15. Reagan arrived at 124 Acadia Road at approximately 9:00 pm on August 1, 2015. (Otto depo. at 16:3-9, 33:24-34:1.)

16. Reagan encountered the Sunken Entryway a single time before her fall—when she entered the cottage. (Reagan depo. at 10:24-11:3, 27:2-9.)

17. Reagan stayed in the cottage with Stephanie, Stephanie's husband, and Reagan's great-granddaughter, Skylar. (Otto depo. at 15:12-18.)

18. Reagan went to bed shortly after arriving at 124 Acadia Road. (Reagan depo. at 11:18-23.)

19. That evening, Reagan woke up very cold, and got up from her bed to close the windows on the first floor. (Reagan depo. at 11:24-12:4.)

20. She "went down to the end of the dining room table and the windows were in back of it. I went right around closed all the windows as I was walking around the table." (Reagan depo. at 12:10.)

21. After closing the window closest to the door, Reagan turned, took a single step, and fell into

2

the Sunken Entryway, hitting her head on a side table. (Reagan depo. at 15:2-13, 31:12- 22.)



When Reagan got up to close the windows, she did not turn on any lights, because there was enough light for Reagan to walk to the open windows.

22. Stephanie heard a loud noise. She went downstairs and saw Reagan lying in the Sunken Entryway. (Otto depo. at 18:20-19:7.)

23. Stephanie and her husband lifted Reagan up. She was moaning and was not speaking well. (Otto depo. at 19:10-14.)

24. Stephanie called Shawn, who drove to 124 Acadia Road. Shawn and Stephanie's husband carried Cahee to Shawn's vehicle and took her to the Emergency Department ("ED") at Bridgton Hospital ("BH"). (Otto depo. at 19:24-20:8.)

## II. MEDICAL TREATMENT /REHABILITATION

25. At 00:43 on August 2, Reagan presented to the ED at BH. (Exhibit A1, BH 0002.)

26. X-rays revealed fractures of the left superior and inferior pubic ramus. (BH 0013.)

27. Reagan also suffered a left ear pinna laceration, which required her ear to be glued together. (BH 0010.)

28. On August 4, 2015, Reagan was transferred to the Bridgton Hospital Swing Bed Skilled Rehabilitation Program. (BH 0009.)

29. While at BH, Reagan was "in severe pain all the time." (Reagan depo. at 16:10-18.)

30. On August 10, 2015, Reagan was discharged from BH. (BH 0231.)

31. She spent the next week recovering at Shawn's cottage. (Reagan depo. at 16:22-17:8.)

32. Thereafter, Shawn escorted Reagan by plane to Tampa, where they met Reagan's daughter Stephanie. (Reagan depo. at 17:20-25; Otto depo. at 23:12-14.)

3

33. Stephanie took care of Reagan for the next eight to 10 days. (Otto depo. at 24:6-7.)

34. During that period, Reagan was in severe pain. She walked with a walker and could not drive. Stephanie "would have to help her in the evenings sometimes get out of bed because it was difficult, get her the walker, steady the walker so she could walk to the bathroom and go to the bathroom." Stephanie also "made all of her dinners" and "did all of her laundry." (Otto depo. 23:16-24:1.)

35. Thereafter, three other family members came to Zephyrhills, one by one, to care for Reagan. Family members "went down as needed after that." (Otto depo. 24:6-25:4.)

36. On August 24, 2015, Reagan's primary care provider, Donald Katz, MD, prescribed a course of home physical therapy for Reagan's pelvic fracture, because Reagan had become "essentially homebound." (Exhibit A4, MHC 0005.)

37. Reagan underwent physical therapy at home from August 24, 2015 to October 9, 2015. (MHC 0006-MHC 0102.)

38. On August 25, 2015, Reagan underwent a bone density scan. The scan demonstrated no evidence of osteoporosis. (Exhibit A3, RR 0046.)

39. Approximately a week into her physical therapy, Reagan was complaining of "increased back pain." (MHC 0033.)

40. On September 19, 2015, Reagan presented to Florida Hospital Zephyrhills with back pain radiating into her right leg. (Exhibit A5, FHZ 0004.)

41. Reagan underwent CT scans of her lumbar spine and pelvis. They demonstrated bilateral sacral ala fractures. (FHZ 0006-0007.)

## III. LOSS OF ENJOYMENT OF LIFE/ ONGOING PAIN

42. Reagan still suffers from lower back pain and pain in her groin every day, which is exacerbated by standing or sitting for long periods. (Reagan depo. at 19:7-20:11.)

43. Reagan's pain prevents her from engaging in many of the activities she used to enjoy: she quit her hospice volunteer work because it is too difficult for her to stand for long periods; she can no longer swim; she can no longer dance; she had trouble sitting through bingo; she can no longer take senior bus trips; she can no longer volunteer at the local clubhouse. (Reagan depo. at 19:20-21:1.)

44. Reagan's lower back pain also makes it hard for her to clean her house, take care of her

4

property, and shower. (Reagan depo. at 21:12-21.)

45. Because she was unable to maintain her home and property, she decided to move from Florida to New York State, where she has family to assist her. (Reagan depo. at 21:2-21; Otto depo. at 27:17-28:14.)

## IV. LIABILITY

46. In Maine, "the owner of premises owes a legal duty to his business invitees to protect them from those dangers reasonably to be foreseen." *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶ 8, 773 A.2d 1045 (quoting *Schultz v. Gould Acad.*, 332 A.2d 368 (Me. 2001).

47. In determining whether the owner "guard[ed] [the plaintiff] against all reasonable foreseeable dangers," the factfinder should consider "the totality of circumstances." *Baker v. Mid Maine Medical Ctr.*, 499 A.2d 464, 467 (Me. 1985).

48. Maine law "imposes on the possessor of land a duty to use reasonable care to prevent risks arising from known and obvious conditions on the land that the possessor should reasonably anticipate causing harm to others." *Colvin v. A R Cable Services-ME*, 1997 ME 163, ¶ 9, 697 A.2d 1289.

49. Moreover, a structure that is open and obvious in the daytime may not be at night. *Franklin v. Maine Amusement Co.*, 175 A. 305, 306 (Me. 1934).

50. As the owner of 124 Acadia Road, Cahee was required to protect Reagan and his other guests from those dangers that were reasonably foreseeable.

51. The danger of abrupt and inconspicuous changes in walking surfaces have been understood for over a century. (Melchior test.)

52. An abrupt and inconspicuous change in walking surfaces is dangerous because, unless a visual cue draws the pedestrian's attention to the change in walking surface, it will likely remain in the pedestrian's peripheral vision, and will likely not be interpreted by the

5

pedestrian as a change in walking surface. (Melchior test.)

53. In 2015, it was understood by ordinary persons that abrupt and inconspicuous changes in walking surfaces were dangerous.

54. The court accepts Mr. Melchior's expert testimony on these issues and concludes his opinions are credible.

The court concludes that the presence of this sunken area in a place where persons were likely to encounter it while walking through the cottage was a hazard and its presence breached the standard of reasonable care owed by an owner to an invitee. This is especially true given that the cottage was rented for short terms and that the sunken area was in a high traffic area near the dining space as well as near a futon which was used for sleeping.

While the sunken area was open and visible, its location in a walking area leads to the conclusion that inadvertent falls could occur due to either distraction as well as it being so close to a sleeping area.

While much of the case focused on the Life Safety Code, the court concludes that while it was applicable and was likely violated and thus evidence of negligence, the conclusion the plaintiff maintained a negligent condition on the premises is independent of that fact.

## V. MEDICAL PROXIMATE CAUSATION

The court concludes that Dr. Finley is a credible witness and is persuaded by his opinion testimony. Accordingly, the court concludes that the pelvic fractures as well as the sacral ala fracture were proximately caused by the fall. Further, the court concludes that the Plaintiff is also credible as to the extent of her damages claimed.

The court specifically adopts Dr. Finley's testimony as indicated here:

55. Reagan's pelvic fractures were caused by her fall on August 1, 2015.

56. Sacral ala fractures can have traumatic and non-traumatic etiologies. However, non-traumatic sacral ala fractures only occur in the setting of osteoporosis.

6

57. Reagan suffered no trauma between August 1 and September 19, 2015. (FHZ 0004.)

58. Sacral ala fractures typically become more painful over time.

59. Reagan's sacral ala fractures were likely caused by her fall on August 1, 2015.

60. Reagan's pelvic fractures have not, and likely will not, fully heal.

61. Reagan's fall on August 1, 2015 was a substantial contributing factor in her continued lower back, pelvic, and groin pain.

62. Reagan's lower back, pelvic, and groin pain are permanent.

## VI. DAMAGES

### I. Medical Bills

A. Reagan is entitled to the reasonable value of the medical services provided to her as a result of Cahee's negligence. *Stubbs v. Bartlett*, 478 A. 2d 690, 692 (Me. 1984).

B. The medical bills for the medical services provided are evidence of the reasonable value of those medical services. *Michaud v. Raceway Gov't Realty*, CV-07-115, 2008 Me. Super. LEXIS 255, *7 (Me. Sup. Ct. Aug. 4, 2008).

C. Catherine Reagan's medical bills attributable to her fall on August 1, 2015 total $45,583.85. (Stipulation Regarding Plaintiff's Medical Bills.)

### II. Pain, Suffering, Mental Anguish, and Loss of Enjoyment of Life

D. Reagan has endured, and will continue to endure, pain and suffering, mental anguish, and loss of enjoyment of life. Reagan's pain and suffering and loss of enjoyment of life include, but are not limited to, the acute pain she experienced after her fall; the enduring pain she has experienced, and will continue to experience; missing her son's wedding; losing her independence and the ability to care for herself and her home.

E. The Court concludes Reagan is a credible witness regarding her activities and limitations and concludes Dr. Findley is credible that the effects of the fall are permanent and TOTAL are substantial contributing factors to the pain and activity limitations she describes. While the aging process is a contributing factor to limitation of activity, Reagan was able to enjoy activities which the injury now also interferes with.

F. Reagan is entitled to $185,000.00 for her past and future pain, suffering, mental anguish,

7

and loss of enjoyment of life.

### III. Permanent Impairment

G.  "An award for permanent impairment provides damages to compensate for permanent loss, loss of use, restriction of motion or impairment of some bodily system or member. It addresses losses separate from pain, suffering, mental anguish or medical expenses." *Hargrove v. McGinley*, 2001 ME 36, ¶ 9, 766 A.2d 587.

H.  Reagan's pelvic fractures are permanent, and constitute a permanent impairment.

The court awards $35,000 in permanent impairment

### IV. Plaintiff's Damages

The court concludes the Plaintiffs total damages are therefore $265,583.85.

### VII. COMPARATIVE FAULT

1.  Comparative negligence is an affirmative defense, for which the burden of proof lies with the defendant. *Nightingale v. Leach*, 2004 ME 22, ‚r 3, 842 A.2d 1277 (citing *Minott v. F.W Cunningham & Sons*, 413 A.2d 1325, 1331 (Me. 1980)).

2.  If a defendant is successful in demonstrating that the plaintiff's injuries were caused, at least in part, by the plaintiffs' own negligence, the damages recoverable by the plaintiff must be reduced to such extent as the fact finder thinks just and equitable having regard to the plaintiffs share in the responsibility for the damage, except that, if the plaintiffs share in the responsibility is at least equal to the defendant's, the plaintiff may not recover. 14 M.R.S. § 156.

The court also concludes the Plaintiff was comparatively at fault. She indicated she was aware and had seen the sunken area. However, the court concludes that the Plaintiffs fault in failing to recognize an invitee might inadvertently encounter this sunken area while walking or doing a task like closing windows in the evening was greater than any comparative fault of the Plaintiff.

8

In circumstances where the Plaintiff has some comparative fault that does not exceed that of the Defendant the court is however required to make a just and equitable reduction of the total damages.

The court concludes a just and equitable reduction is in the amount of $20,000.

## VIII. CONCLUSION

The court concludes Plaintiff has proven negligence and proximate causation with damages as detailed above.

The court also concludes Defendant has proven comparative fault. However, that comparative fault does not exceed that of the Defendant's negligence. The court makes the equitable deduction from Plaintiff's damages as set forth above.

Accordingly, the Judgment for Plaintiff is in the amount of $245,583.85. Plus, applicable interests and court costs.

The clerk may incorporate this judgment by reference into the docket.

Date:___2/18/22___          _____
                            John O'Neil, Jr.
                            Maine Superior Court

Entered on the Docket: 02/18/2022

9